# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

ASSOCIATION OF FLIGHT ATTENDANTS-
CWA, AFL-CIO; AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL; and
AIRCRAFT MECHANICS FRATERNAL
ASSOCIATION;

                  Appellants,

v.                    **MEMORANDUM OF LAW & ORDER**
                             Civil File No. 06-3041 (MJD)

MESABA AVIATION, INC.,
d/b/a Mesaba Airlines,

                  Respondent.

_____

Joel D. Nesset and Mary L. Cox, Henson & Efron, PA; and Robert S. Clayman and Soye Kim, Guerrieri, Edmond, Clayman & Bartos, P.C.; Counsel for Appellant Association of Flight Attendants-CWA, AFL-CIO.

Brian F. Leonard and James M. Jorissen, Leonard, O'Brien, Spencer, Gale & Sayre, Ltd.; and James L. Linsey and Joseph J. Vitale, Cohen, Weiss & Simon LLP; Counsel for Appellant Air Line Pilots Association, International.

Nicholas P. Granath and Lucas K. Middlebrook, Seham, Seham, Meltz & Petersen, LLP, Counsel for Appellant Aircraft Mechanics Fraternal Association.

Michael F. McGrath, Michael L. Meyer, and Will R. Tansey, Ravich Meyer Kirkman McGrath & Nauman, P.A.; and Cynthia M. Surrisi and Kenneth B. Hipp, Marr Hipp Jones and Wang, a Limited Liability Law Partnership; Counsel for Appellee Mesaba Aviation, Inc.

_____

## I.    INTRODUCTION

    This matter is before the Court on Appellants' consolidated appeal of the

following bankruptcy court orders in <u>In re Mesaba Aviation, Inc., dba Mesaba Airlines</u>, BKY 05-39258 (Bankr. D. Minn.):

1.  Order Granting Debtor's Renewed Motion for Authority to Reject Collective Bargaining Agreements issued on July 14, 2006;

2.  The memorialized decision made on the record in court on July 14, 2006;

3.  The incorporated Order Denying Debtor's Motion for Authority to Reject Collective Bargaining Agreements dated May 18, 2006 [Docket No. 613];

4.  Order Granting Debtor's Motion for Order Setting Pre-hearing Schedule, for Protective Order, and for Order in Limine in Connection with Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. Section 1113 of February 10, 2006 [Docket No. 397].

This case greatly affects the lives of many people. The cuts proposed by Mesaba will force professionals who have dedicated their lives to the airline industry to seek other work. Some will become unemployed; others will join the ranks of the uninsured. They will work too much for too little money. It is a joyless task to participate in the undoing of hard-fought labor agreements and allow hard-working men and women to be underpaid.

Bankruptcy law is draconian to labor unions. Numerous airlines have been in Chapter 11 bankruptcy in the last few years: Aloha Airlines, ATA Airlines, Comair, Delta Air Lines, Era Aviation, Hawaiian Airlines, Independence Air, Mesaba Airlines, Northwest Airlines, United Airlines, and US Airways. The results

2

are disastrous for labor.  Northwest pilots recently agreed to a pay cut of 24% over

a 5 ½ year contract.  A bankruptcy court has approved imposition of a proposal

that Northwest flight attendants claim will lower their take-home pay by up to

40%.  This year, Delta's pilots agreed to a new contract with a 14% pay cut, a

concession that followed a 2004 agreement in which Delta's pilots had already

agreed to a 33% wage cut.  Unfortunately, these severe compensation cuts are

occurring throughout the airline industry.

This Court's duty is to review the bankruptcy court's decisions for error.

The Court's review is constrained by the record and by the law.

After a careful review, the Court reverses the bankruptcy court's decisions

with respect to two issues: Mesaba's refusal to negotiate snap-back provisions and

its failure to demonstrate that its Proposals fairly and equitably spread the burden

of reorganization among all relevant affected parties, particularly MAIR.  It affirms

the remainder of the bankruptcy court's decisions.[1]

## II.    BACKGROUND

### A.    Mesaba and Its Parent Corporation

Appellee Mesaba Aviation, Inc. ("Mesaba") is a Minnesota corporation and

regional airline that serves as a regional airlink partner to Northwest Airlines

---

[1]The bankruptcy court did an excellent and thoughtful job, particularly
given the time constraints and volume of evidence in this matter.

("Northwest").  Mesaba transports passengers from outlying airports to Northwest's three hubs in the Twin Cities, Detroit, and Memphis.

Mesaba is a wholly-owned subsidiary of MAIR Holdings, Inc. ("MAIR"), a publicly traded company.  Ninety-five percent of MAIR's revenues are generated from Mesaba.  However, MAIR does own another airline, Big Sky Transportation Co.  From October 2003 to October 2005, Mesaba transferred approximately $40 million to MAIR.  As of December 31, 2005, MAIR had $75.5 million in cash and $27.8 million in liquid, short-term investments.

**Northwest owns 27.5% of MAIR's issued and outstanding common stock and owns warrants to purchase, subject to vesting requirements, over 4 million additional shares.  Northwest has the right to veto the chief executives of both MAIR and Mesaba.**

Since 1996, Mesaba has flown exclusively for Northwest.  Mesaba has flown two principal types of aircrafts: 34-seat Saab 340 turbo-prop airplanes ("Saabs") and 69-seat, four-engine Avro regional jets ("ARJs" or "Avros").  Mesaba and Northwest had two separate Airline Services Agreements ("ASAs") that governed their relationship.

After September 11, 2001, Mesaba's profits fell, and its operating margins or earnings before interest and taxes ("EBIT") margins fell to 3.03% in 2003 and 2.47% in 2004.

4

### B.   Northwest-Mesaba Contract

On August 29, 2005, Northwest and Mesaba entered into a ten-year contract (the "Omnibus ASA") covering three types of aircrafts: the Saabs, the Avros, and Canadair Regional Jets ("CRJs").  In September 2005, Mesaba had a fleet of 100 aircraft: 35 Avros, 63 Saabs, and 2 CRJs.  It expected to add 13 more CRJs under the Northwest contract.

While negotiating the Omnibus ASA, Mesaba thought that Northwest might file for bankruptcy.  Based on testimony before it, the bankruptcy court made the credibility determination that Mesaba and MAIR believed that, even in bankruptcy, Northwest would honor the Omnibus ASA.  In a separate agreement between Northwest and MAIR, MAIR provided inducement for Northwest to enter the Omnibus ASA by reducing the exercise price on Northwest's existing warrants to purchase MAIR stock and by agreeing to infuse $31.7 million as a one-time capital contribution to Mesaba.  On September 7, 2005, MAIR made its $31.7 million capital contribution to Mesaba.

### C.   Northwest and Mesaba Bankruptcies

On September 14, 2005, Northwest filed for bankruptcy and then defaulted on $38.7 million in payments owed to Mesaba.  Mesaba later offset $8.7 million of its own obligations to Northwest against these liabilities.  Northwest made clear that, by the end of 2006, Mesaba's fleet would be reduced to only 49 Saabs.

Additionally, Mesaba would have to reduce the price it charged Northwest under the Omnibus ASA. On October 13, 2005, Mesaba filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

### D.    Mercer Model

Mesaba hired Mercer Management Consultants ("Mercer") to analyze Mesaba's options in the face of Northwest's bankruptcy. Working with Mesaba, Mercer created the Mercer Model, a multi-variable electronic spreadsheet designed to project Mesaba's financial performance.

On December 2, 2005, Mesaba developed a new business plan, based on the Mercer Model, that projected revenues and expenses over a term of 6 ½ fiscal years. Based on the financial model developed by Mercer, Mesaba concluded that it would need a target 8% EBIT margin by fiscal year 2012 to attract debtor-in-possession ("DIP") financing or exit financing and emerge from Chapter 11 as a viable business. The Mercer Model and business plan assumed that Mesaba would only have a fleet of 49 Saabs and that it would need to grant a 5% rate reduction on the Saabs to retain Northwest's business. Based on these assumptions, Mesaba would need to cut operating expenses by $66.4 million per year in order to have an 8% EBIT margin. After first cutting all non-labor operating expenses as much as possible, Mesaba would need $17.1 million in labor cost reductions - a 19.4% reduction in labor costs. Mesaba assumed that the most senior union employees

would remain with Mesaba under the new six-year contract.  The business plan

applied this 19.4% reduction to all employees, including non-unionized employees

and management.

### E.       Northwest CRJ Request for Proposals

On December 9, 2005, Northwest issued a request for proposals ("RFP")

seeking bids for flying 20 to 126 CRJs.  Mesaba and seven other airlines submitted

bids.  Mesaba's initial bid, dated January 17, was contingent upon Mesaba

reducing its labor costs by 19.4% on all aircraft, including the Saabs.  However,

Mesaba still had one of the higher cost bids.

On January 31, Mesaba submitted a revised CRJ bid ("Revised CRJ Bid").

The Revised CRJ Bid was also contingent upon a 19.4% reduction in labor costs

on all aircrafts.  This bid was still not the lowest bid submitted, but was "in the

ballpark."  As of the time of the last hearing before the bankruptcy court,

Northwest had not yet awarded the CRJ RFP; nor had it indicated when it would

issue a decision.

### F.       Original Section 1113 Proposals

In early December 2005, Mesaba made proposals to replace the existing

collective bargaining agreements ("CBAs") to each of the three appellant unions -

Association of Flight Attendants-CWA, AFL-CIO ("AFA"), Air Line Pilots

Association, International, ("ALPA"), and Aircraft Mechanics Fraternal Association

("AMFA") (collectively "Unions") - under 11 U.S.C. § 1113 ("Original Section 1113 Proposals"). The Proposals were based on the December 2, 2005 business plan and all included a 19.4% cut in labor costs over a six-year term.

After receiving the Original Section 1113 Proposals, the Unions requested that Mesaba provide them with an electronic, working version of the Mercer Model, but Mesaba refused to provide such a model until after the close of the hearing on the Original Section 1113 Proposals.

Mesaba and the Unions could not come to an agreement on the Original Section 1113 Proposals. On February 2, 2006, Mesaba filed a Motion to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113.

On February 10, 2006, the bankruptcy court ruled that, in the context of the Section 1113 motion, the Unions could not take discovery or introduce evidence related to Mesaba's potential claims against MAIR. (Feb. 10 Order ¶¶ 18-19.)

The Section 1113 hearings began on February 24, 2006 and continued through March 2006. On May 18, 2006, the bankruptcy court issued an order denying without prejudice Mesaba's motion to reject the CBAs. In re Mesaba Aviation, Inc., 341 B.R. 693 (Bankr. D. Minn. 2006). The court held that Mesaba had "met most of the procedural prerequisites and substantive requirements to obtain court authorization for it to reject its collective bargaining agreements with

its unions." Id. at 760.  However, it had failed to provide the Unions with the

relevant information that they needed to evaluate the Proposals by failing to

provide them with a working or electronic copy of the Mercer Model.  Id. at 717.

This action demonstrated bad faith.  Id. at 729.  The court also held that Mesaba

demonstrated bad faith regarding a promise for cost savings credit to ALPA and

that its Proposals were substantively flawed because Mesaba had not included a

true-up provision to address its unsupported assumption that attrition would

include no senior employees.  Id. at 727-28, 745-47.  It also held that the Unions

had good cause for rejecting the Original Section 1113 Proposals

> to the extent that [Mesaba] had not given them the informational
> wherewithal to raise their comfort level to an acceptance of the core
> of the proposal, the 19.4% overall reduction in labor costs that
> [Mesaba's] financial straits have compelled.  Insofar as the proposal
> contained a few provision that have been held substantively lacking
> in this order, the unions did have good cause to oppose [Mesaba].
> Given the outcome on this motion as to the remaining substance of
> the proposal, they did not have good cause to reject or oppose
> [Mesaba] on that account, or to maintain that position to the point of
> litigating these issues at such length.

Id. at 755.  The court did hold that a 19.4% labor costs cut and six-year contract

terms were necessary.  Id. at 742-43, 757.

Although the bankruptcy court denied Mesaba's motion, it conveyed to the

parties that it would likely approve a renewed motion if Mesaba corrected the

flaws pointed out by the court.  Id. at 763.

### G.    Northwest Saab Proposal

In March 2006, Mesaba submitted a proposal to Northwest to retain the Saab flights and to avert the likelihood of Northwest putting out an RFP for the Saabs. The proposal assumed that Mesaba will achieve its planned cost reductions, including a 19.4% labor cost reduction, and provided Northwest a 5% rate reduction. As of the date of the hearing on the Renewed Motion before the bankruptcy court, Northwest had not accepted Mesaba's proposal; nor had it sent out a Saab RFP.

### H.    Northstar Model

At the end of March 2006, Mesaba finally provided a dynamic working version of the Mercer Model to the Unions. In April 2006, Mesaba provided the Unions with a working copy of a new business model that forecasts Mesaba's revenues and expenses based on a detailed, "bottoms up" forecast ("Northstar Model"). In contrast, the Mercer Model was a top down, high-level forecast. Mesaba had used the Northstar Model to prepare its CRJ bids to Northwest. On April 27, Mesaba informed the Unions that the Northstar Model provided more accurate information than the Mercer Model, so Mesaba would no longer update the Mercer Model. Under the Northstar Model, with the previously assumed cost reductions, Mesaba's operating margin would not reach its target of 8% by fiscal year 2012.

### I.    Renewed Section 1113 Motion

On May 31, June 1, and June 2, 2006, Mesaba presented Renewed Section 1113 Proposals based on the Northstar Model to the Unions.  These Proposals included the same 19.4% labor cost reductions over a minimum six-year contract term.  In response to the bankruptcy court's May 18 Order, Mesaba did include a true-up provision to address its attrition assumptions.  The parties could not reach agreement, and on June 12, Mesaba filed a Renewed Motion for Authority to Reject Collective Bargaining Agreements ("Renewed Section 1113 Motion").

The Unions filed objections to the Renewed Section 1113 Motion on June 21, 2006.  In response to those objections, Mesaba provided an updated financial projection, Northstar II, based on more current financial information.

One of the changes related to the "task."  When Mesaba made its first CRJ proposal to Northwest in January 2006, it discovered that, even with the cost reductions stated in the business plan, Mesaba was $4.3 million short of giving Northwest a 5% rate cut and still attaining an 8% operating margin.  So, Mesaba built a $4.3 million task into its CRJ bid, generic additional cuts that Mesaba needed in order to provide the 5% reduction and still maintain an 8% margin. When Mesaba presented the projections from the Northstar II, it included the task as a shortfall in the operating margin.

The bankruptcy court held hearings on the Renewed Motion beginning June 26 and ending June 29.  On July 14, 2006, the bankruptcy court issued its

11

decision on the record, granting Mesaba's Renewed Section 1113 Motion and authorizing Mesaba to reject its CBAs with the Unions upon ten days' notice. The oral ruling incorporated the "analysis and holdings" of the May 18 Order. (July 14, 2006 Tr. at 7.)

On July 18, 2006, the Unions filed a notice of appeal from the bankruptcy court in this Court. On July 20, they requested an expedited appeal. The Court set a modified briefing schedule and heard oral argument on August 31, 2006.[2] As of today's date, Mesaba has not given notice to reject the CBAs.

## III.   DISCUSSION

### A.   Standard of Review

This Court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions and conclusions involving mixed questions of law and fact de novo. DeBold v. Case, 452 F.3d 756, 761 (8th Cir. 2006). "A finding is clearly erroneous when although there is evidence to support it . . . the reviewing court is left with the definite and firm conviction that a mistake has been committed." Id. (citation omitted). Under the clearly erroneous standard, when "the evidence presented in the record could be susceptible to differing interpretations, [the

---

[2]The Court commends the attorneys for all parties who argued the appeal in this case. They demonstrated professionalism, ably fulfilling their roles as zealous advocates for their clients and as outstanding officers of the Court. Oral argument was clear and well presented. The Court found the parties' respective presentations to be extremely helpful in this matter.

reviewing court] may not hold that the bankruptcy court's chosen interpretation is

clearly erroneous where there is more than one permissible view of the evidence.

In addition, even greater deference to the bankruptcy court's factual findings is

necessary where . . . the findings call for an assessment of witness credibility and

where the record contains no contradictory documents or objective evidence." In

re Hixon, 387 F.3d 695, 700 (8th Cir. 2004) (citations omitted).

> **B.      Whether the Bankruptcy Court Erred in Concluding that
> Mesaba Met the Requirements of 11 U.S.C. § 1113 to Reject the
> CBAs**

> **1.      Standard for Rejecting CBAs**

The Bankruptcy Code permits a bankrupt employer to reject its collective

bargaining agreements under certain circumstances, which the bankruptcy court

concluded were met in this case.  The parties agree that, under 11 U.S.C. § 1113,

the bankruptcy court shall allow rejection only if the Chapter 11 debtor meets

nine requirements:

> 1. The debtor in possession must make a proposal to the Union to
> modify the collective bargaining agreement.

> 2. The proposal must be based on the most complete and reliable
> information available at the time of the proposal.

> 3. The proposed modifications must be necessary to permit the
> reorganization of the debtor.

> 4. The proposed modifications must assure that all creditors, the
> debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

In re Am. Provision Co., 44 B.R. 907, 909 (Bankr. D. Minn. 1984) (footnote omitted). "[T]he debtor bears the burden of persuasion by the preponderance of the evidence on all nine elements." Id. The assignment of the initial burden of production depends on the circumstances of the case. Id.

The bankruptcy court's interpretation of the statute, specifically its reading of what the debtor must prove before the court may approve rejection, does constitute a conclusion of law subject to plenary review. If the bankruptcy court correctly interprets the statute, however, its conclusions as to whether the debtor has or has not proven compliance with the statute will generally be factual findings which can be reversed only if clearly erroneous.

Truck Drivers Local 807 v. Carey Transp., Inc., 816 F.2d 82, 88 (2d Cir. 1987) (citations omitted).

**2.    Whether the Bankruptcy Court Erred in Finding that the Proposed Modifications Are Necessary**

14

### a.      Legal Standard for Necessity

The Unions assert that the bankruptcy court incorrectly interpreted the requirement that the proposed modifications be "necessary to permit the reorganization of the debtor."  The bankruptcy court's interpretation of the necessity element is reviewed de novo.

### i.      Applicable Standard

The Eighth Circuit Court of Appeals has not decided the correct standard to determine necessity.  The Second Circuit holds that "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."  Carey Transp., 816 F.2d at 90.  "[I]n virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health."  Id. at 89.

In contrast, the Third Circuit holds that "necessary" includes "only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization," and requires the court to focus "on the somewhat shorter term goal of preventing the debtor's liquidation . . . rather than [on] the longer term issue of the debtor's ultimate future."  Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of Am.,

AFL-CIO-CLC, 791 F.2d 1074, 1088-89 (3d Cir. 1986).

The Court concludes that the bankruptcy court correctly adopted the more flexible standard set forth in Carey.  Mesaba, 341 B.R. at 731.  As it noted, the Carey standard "appears to have taken a majority among subsequent published decisions."  Id.  After all, "[t]he goal to be served by modifying the collective bargaining agreement, and by the entire Chapter 11 proceeding, is not simply a reorganization, but a successful reorganization, i.e., one from which the debtor emerges as an economically viable operation."  In re Mile Hi Metal Sys., Inc., 899 F.2d 887, 893 (10th Cir. 1990) (citation omitted).  The Carey interpretation provides the more accurate reading of Section 1113 in its context as part of the larger bankruptcy statute aimed at "providing for the long-term rehabilitation of distressed businesses."  Mesaba, 341 B.R. at 730-31.

The Carey interpretation is further bolstered by the Eighth Circuit Bankruptcy Appellate Panel's holding "that 'necessary to permit the reorganization of the debtor' means necessary to accommodate confirmation of a Chapter 11 plan."  In re Family Snacks, Inc., 257 B.R. 884, 897 (B.A.P. 8th Cir. 2001).  In Family Snacks, Inc., the Bankruptcy Appellate Panel did not decide whether the Section 1113 "necessary" standard should be interpreted under Carey or Wheeling-Pittsburgh in the non-liquidation context.  See 257 B.R. at 898.  Instead, it only decided the "precise question [of] whether a debtor must comply with

§ 1113 before it sells its assets." Id. at 894.  However, the standard for

confirmation of a reorganization plan, as opposed to a liquidation plan such as the

one in Family Snacks, requires the bankruptcy court to decide that confirmation of

the reorganization plan is "not likely to be followed by the liquidation, or the need

for further financial reorganization, of the debtor or any successor to the debtor

under the plan, unless such liquidation or reorganization is proposed in the plan."

11 U.S.C. § 1129(a)(11).  See also Carey Transp., 816 F.2d at 89 ("In making the

decision whether to permit the debtor to reject its bargaining agreement,

however, the court must consider whether rejection would increase the likelihood

of successful reorganization.  A final reorganization plan, in turn, can be

confirmed only if the court determines that neither liquidation nor a need for

further reorganization is likely to follow.").  The Carey standard is designed to

prevent the debtor from quickly falling into liquidation or another Chapter 11

proceeding by ensuring that it can compete following its reorganization.

### ii.    Interpretation of the Carey Standard

The Unions assert that, even if the Carey standard is the correct standard,

the bankruptcy court erroneously interpreted the Carey standard by judging what

proposals would be "best" for Mesaba's prospects, not what would be "necessary"

to a successful reorganization.  The Court has reviewed both the May 18 and July

14 decisions in their entirety, as well as the passages cited by the Unions, and

concludes that the bankruptcy court correctly interpreted the <u>Carey</u> necessity standard.

When the passages cited by the Unions are put into context, it is clear that the bankruptcy court correctly interpreted the <u>Carey</u> standard.  The court did not judge necessity as what would be "best" for Mesaba, but rather, concluded that,

> in emerging from Chapter 11 into an intensely competitive market, a debtor should come forward close to the top of the heap in strength, rather than at the bottom.  Otherwise, it will not have the flexibility to remain competitive, or present the general attraction of future stability to prospective airlink partners.  And a lack of those qualities may well lead to a second financial failure.

<u>In re Mesaba Aviation, Inc.</u>, 341 B.R. 693, 738-39 (Bankr. D. Minn. 2006).  The bankruptcy court correctly concluded, "A debtor may not and does not proceed under Section 1113 unless a proposed modification is essential to the future survival of the business."  (July 14, 2006 Tr. at 25.)  It also held, "The Debtor's evidence was sufficient to establish that it will not survive as an operating airline if it does not get the total reduction of 19.4%. . . .  If the Debtor does not obtain the concessions and put them into operation, liquidation is inevitable."  341 B.R. at 757-58.

The bankruptcy court employed the correct legal standard.  Whether the court was correct in determining that the concessions sought by Mesaba were necessary to meet this standard are factual determinations reviewed for clear error and addressed in the next section.

18

### b.      Factual Findings Related to Necessity

### i.      Mesaba's Need for an 8% Margin

In its May 18 Order, the bankruptcy court concluded that an 8% target

margin was necessary under Section 1113.  <u>Mesaba</u>, 341 B.R. at 740-41.  The

Unions dispute whether a particular operating margin can be necessary and, if so,

whether 8% is the appropriate margin.

### aa.      Significance of the Operating Margin

The Unions claim that no particular operating margin is necessary because

potential Mesaba investors will not make investment decisions based on the

operating margin.  The Unions assert that the bankruptcy court contradicted itself

by stating,

> Lenders and investors look first and foremost to <u>recovery in cash</u>, the
> fungible form that is eminently suited to immediate enjoyment or
> reinvestment.  Pledged collateral, "asset strength," or net shareholder
> equity is desirable for lenders, but realization on it after failure of a
> going concern entails delay, cost, <u>and risk</u>.  As a vehicle of
> satisfaction, security is a second consideration for prospective lenders,
> an avenue of recourse and not their first wish.  So, there is every bit
> of sense in the fundament of the Debtor's experts' opinions: in an
> industry as risky as air transportation is currently, operating margin is
> the most significant consideration any prospective lender or investor
> would apply.

<u>Mesaba</u>, 341 B.R. at 740.  The bankruptcy court did not contradict itself by both

stating that potential investors look primarily to return on investment and that,

based on the record in this case, targeting a particular EBIT margin is necessary to

attract those investors.  In context, the court's explanation is logical.

The Unions also assert that investors consider a broad range of factors before investing, such as volume of revenue, opportunity for revenue growth, and liquidity, and would be willing to accept a lesser EBIT margin if the investment yields a large return.  They point to evidence in the record that overall return on investment, rather than operating margin, is the most important consideration for prospective financiers.  However, the record also contains testimony supporting Mesaba's claim, and the bankruptcy court's finding, that investors would place importance on Mesaba's operating margin.

> The bankruptcy court reasoned that the evidence before it
>
> well-establishes that the degree of risk, the likelihood of prompt recovery of the principal, will ultimately couch a prospective lender's expectations for the Debtor's post-confirmation performance.  That risk, of course, is to be determined in the very first instance by the Debtor's ability to generate enough net cash to reduce principal and to make debt service.  For a higher-risk placement, a lender is likely to demand more accelerated payment terms.  The ability to satisfy such a requirement depends entirely on the generation of 'profit,' the operating margin.

In re Mesaba Aviation, Inc., 341 B.R. 693, 739 (Bankr. D. Minn. 2006) (footnote omitted).

The bankruptcy court's factual finding that potential Mesaba investors would give the operating margin significant consideration is supported by testimony in the record, and its credibility determination to accept the testimony

of Mesaba's witnesses is not clearly erroneous.

### bb.     Significance of 8% Operating Margin

The Unions assert that even if Mesaba's operating margin is important, the record fails to support the necessity of an 8% margin in particular.  Mesaba has not yet estimated its particular exit financing needs; thus, they claim, it cannot argue that it needs an 8% margin to obtain such exit financing.

Mesaba's need for an 8% margin is supported by the record.  It sought advice from its professional financial consultants, Mercer, in developing its business plan.  Mercer determined that an 8% EBIT margin was necessary for Mesaba to attract investment to exit bankruptcy and to be competitive with other regional airlines with high EBIT margins.  Based on Mercer's advice, Mesaba concluded that an 8% margin was necessary.  Testimony from various witnesses before the bankruptcy court supported this finding.

The record supports Mesaba's claim that it cannot base proposed labor cost cuts on a target number of its probable financing needs when it exits bankruptcy because there are too many variables in a Chapter 11 case to estimate the amount of exit financing until later in the reorganization process.  The bankruptcy court did not clearly err in finding that Mesaba cannot afford to carry its pre-bankruptcy labor costs until the end of the Chapter 11 process.  For example, at the time of the first hearing before the bankruptcy court, Mesaba was projected to run out of

cash at the end of August 2006, absent DIP financing.  341 B.R. at 758 n.96.  If it had waited until the amount of exit financing could be ascertained before offering Section 1113 Proposals, it would have faced liquidation.  Finally, the Unions cite to no legal authority for requiring exit financing analysis in the context of a Section 1113 motion.

### cc.    Whether the 19.4% Cut Is Necessary

The Unions do not dispute that, if the Court affirms the bankruptcy court's finding that an 8% EBIT margin is necessary, the bankruptcy court did not clearly err in a finding that 19.4% labor cost cut is required to achieve that margin. Additionally, the bankruptcy court concluded that Mesaba's survival was dependent on Northwest's business and that incorporation of the 19.4% labor cost cut was necessary for Mesaba to maintain the Saab business and possibly gain the CRJ business.  (July 14, 2006 Tr. at 29-36.)  This conclusion was not clearly erroneous.

Based on the necessity of an 8% EBIT and the necessity of a 19.4% labor cost cut to gain Northwest's business, the Court concludes that the bankruptcy court did not err in holding that the 19.4% labor cost cut is necessary.

### ii.    Need for Six-Year Contracts

The Unions assert that the record does not support the bankruptcy court's finding that the labor cost cut had to last for six years.  The Unions assert that a

six-year contract is particularly damaging because the proposed pay cuts are so large.  They also note that Northwest has never communicated to Mesaba that it must obtain six-year contracts.

> The bankruptcy court held that
>
> the Debtor in this case has less direct control over its destiny than almost any other airline-debtor.  The Debtor must maximize its projection of fiscal stability in order to make its case on bidding for work from mainline carriers.  There is sufficient proof in the record to support a finding that six years of anticipated predictability on the level of labor costs will most enable it to do that, and will best promote its long-term financial health by increasing its chances of winning such bids.

In re Mesaba Aviation, Inc., 341 B.R. 693, 742-43 (Bankr. D. Minn. 2006) (footnotes omitted).  The court reasoned that because unions had consented to comparable contract durations in other recent airline Chapter 11 cases, Mesaba would be better able to attract an airlink partner if it could assure similar stability as it emerged from bankruptcy.  Id. at 743 n.69.

The bankruptcy court's finding was not clearly erroneous.  For instance, the testimony of Mesaba's President, John Spanjers, supports a finding that the six-year term is necessary given Mesaba's need to stabilize and successfully bid for air services agreements, which fix revenues for up to ten years, and the length of similar labor contracts with other airlines emerging from bankruptcy.  Additionally, there was evidence that the Unions had agreed to six-year contracts in other recent airline bankruptcies.  Although an alternative finding would be

reasonable, given the deference with which the Court reviews this factual

determination, the Court affirms the bankruptcy court's finding.

### 3.   Whether Mesaba Satisfied the Procedural Requirements of Section 1113

#### a.   Existence of Detailed Factual Findings

In the bankruptcy court's July 14, 2006 oral opinion, it stated:

> In briefing the Unions accused the Debtor of having failed most of the procedural requirements framed by <u>American Provision Company</u> during the ten-week span between the close of the hearing on the first motion and the filing of the current motion, and in particular, on the rush of bargaining effort during the month of June.

> Now, both sides produced evidence that support my general conclusion that it was a messy process, that it was extremely frustrating for both sides, that it was increasingly characterized by frantic and demanding behavior on the part of all participants, and that it was obviously quite unproductive of any consensual resolution on any major issue, let alone the whole thing.

> Beyond that, I'm going to decline to get into any more specific fact finding on the making of any harsh judgments against any participants on either side.  That would serve no purpose whatsoever . . .

(July 14, 2006 Tr. at 77-78 (underlining added).)

The Unions claim that this statement demonstrates that the bankruptcy

court failed to reach a decision on whether Mesaba had met its burden of proof

regarding whether 1) it agreed to meet at reasonable times with the Unions; 2) it

conferred in good faith with the Unions; 3) it furnished the Unions with relevant

information necessary to evaluate its Renewed Section 1113 Proposals; or 4) it

24

based the Renewed Section 1113 Proposals on the most complete and reliable information available at the time the Proposals were presented to the Unions.  <u>See Am. Provision Co.</u>, 44 B.R. at 909; <u>see also</u> 11 U.S.C. § 1113.

The Court rejects the Unions' objection.  After the quotation provided by the Unions, the bankruptcy court did make explicit factual findings for each of the Section 1113 procedural requirements mentioned by the Unions:

> So I'm going to conclude in general on the basis of the timing of the Debtor's proffer of the current proposals, the furnishing of the Northstar Model output and associated data, the arrangements for meetings that the Debtor made, and the sessions actually conducted as they were that the Debtor has at least barely met the requirements that it have based its current proposal on the most complete and reliable information that [is] available, that it provide enough relevant information to the Unions to enable their evaluation, that it meet with the Unions at reasonable times, and that it have conferred in good faith during those meetings to try to reach consensual accords.

(July 14, 2006 Tr. at 81.)  Additionally, the bankruptcy court explicitly incorporated its May 18 Order, in which it found that Mesaba had met many aspects of the Section 1113 factors, into its July 14 decision.

### b.    Section 1113's Information Requirements

The second <u>American Provision</u> factor requires Mesaba to demonstrate that its Proposals were "based on the most complete and reliable information available at the time of the proposal," and the fifth factor requires that it provide the Unions "such relevant information as is necessary to evaluate the proposal."  <u>Am.</u>

25

Provision, 44 B.R. at 909.  The Unions claim that the record does not support a finding that Mesaba met either factor.

### i.   Whether the Renewed Proposals Were Based on Complete and Reliable Information

The Unions assert that Mesaba's Renewed Section 1113 Proposals, presented on May 31 through June 2, were not based on the most complete and reliable information available at the time.  They note that Mesaba re-ran the Northstar Model on the weekend of June 24-25 using revised assumptions and data in response to the Unions' June 21 opposition.  These updated projections were provided to the Unions on the first day of the hearing on the Renewed Section 1113 Motion.  The main changes between the Northstar I projections and the Northstar II projections were that the Northstar II projections:

1) incorporated new June 1 term sheets for each labor group;

2) increased fixed costs by $1.3 million;

3) increased management and non-contract hourly wages by $2.5 million;

4) removed the $4.3 million task; and

5) decreased the annual escalation for wage increases from 3% to 1%.

The Unions admit that the revisions were, at least in part, in response to their objections filed on June 21.  However, they claim that some of the "new" information in the Northstar II projections was several months old.  For example,

Mesaba was aware of the necessity of the task for several months before the hearing on the Renewed Section 1113 Motion.  Additionally, Mesaba's Renewed Section 1113 Proposals relied on labor cost assumptions prepared a few months earlier.  However, Mesaba had internally generated updated labor cost valuations in May and June, but did not incorporate them into the Northstar Model.  It was not until June 26 that Mesaba presented a financial model reflecting its June 1 labor assumptions.

The bankruptcy court acknowledged that, when Mesaba first began to use the Northstar Model to build its CRJ bid, it included the unallocated task.  The court did not "fault the Debtor for doing this given the make or break nature of the exercise or continuing participation in the CRJ RFP process.  Northwest slammed a rather strict deadline on the Debtor for that."  (July 14, 2006 Tr. at 58.)  By the time of the hearing on the Renewed Motion, Mesaba had not fulfilled the task, so, during the hearing, "with the testimony of its witnesses and the use of Debtor's Exhibit 1027 . . . the Debtor ultimately corrected the net result."  (Id. at 60.)

The bankruptcy court concluded that the Unions' objections to the Northstar Model's task and 3% wage increases were corrected during the hearing and noted that those corrections still kept Mesaba's projected operating margin below 8% through fiscal year 2012.  (Id. at 60, 63.)  Thus, the objections did not

invalidate the necessity of the 19.4% labor cost reduction.   (<u>Id.</u> at 63.)

The bankruptcy court's finding that Mesaba met this factor is not clearly erroneous.  The information underlying Mesaba's Renewed Section 1113 Proposals did not need to be perfect, but it was required to make "an honest effort to compile all data relevant to making its proposal."  <u>In re U.S. Truck Co. Holdings, Inc.</u>, Case No. 99-59972-WS, 2000 Bankr. LEXIS 1376, at *39 (Bankr. E.D. Mich. Sept. 29, 2000).  When Mesaba presented the Renewed Section 1113 Proposals to the Unions, it provided the most recent Northstar projections it had generated to date, and, at the time, Mesaba did not yet have the benefit of the Unions' June 21 objections.  When Mesaba discovered errors in its model after the Unions' objections, it corrected those errors and the corrections did not alter the necessity of the 19.4% labor cost cut.  <u>See</u> <u>In re Indiana Grocery Co., Inc.</u>, 138 B.R. 40, 47 (Bankr. S.D. Ind. 1990) (finding factor met when employer's mistakes "were inadvertent and not deliberately concealed from the union, and . . . were not of a sufficient magnitude to significantly change the figures on which [the employer] made its proposals").

Additionally, the Northstar I output and the Northstar II output were both generated from the same electronic model: the Northstar Model.  The Northstar II output did not change Mesaba's plan to make a 5% rate cut in order to secure Northwest's Saab contract; nor did it change Mesaba's target of 19.4% in labor

28

savings, despite the fact that the task could not be realized elsewhere and the

revisions resulted in an operating margin below 8%.

> ### ii.     Provision of Relevant Information Necessary for the Unions to Evaluate the Renewed Proposals

The bankruptcy court found that Mesaba provided enough relevant

information to the Unions to enable them to evaluate its Renewed Proposals.  The

Unions dispute this finding.  They argue that the changes that Mesaba made to

the Northstar Model, resulting in the Northstar II output, such as the task, fixed

cost increases, and revised labor cost estimates, demonstrate that it provided

unreliable data to the Unions before they objected.  They also fault Mesaba for

failing to produce an electronic model of the Northstar II until after the close of

the hearing on the Renewed Motion.

The Court affirms the bankruptcy court's finding that Mesaba met the

requirement to provide relevant information to the Unions.  This factor required

Mesaba to provide what was relevant as of the filing of its Renewed Section 1113

Motion.  11 U.S.C. § 1113(b)(1).

Mesaba provided a large amount of information to the Unions from the

time it presented its initial Section 1113 Proposals until the time of the hearing on

the Renewed Section 1113 Motion, including an electronic version of the

Northstar Model.  Before filing its Renewed Motion, Mesaba provided the Unions

with the electronic Northstar Model and the output of that model that had been generated at the time.  This information permitted the Unions to adequately evaluate Mesaba's Renewed Section 1113 Proposals.

Although Mesaba did change some of the data and assumptions in the Northstar Model the weekend before the hearing on the Renewed Motion, the Northstar Model itself did not change.  The structure, formulae, and operation of the dynamic Excel spreadsheets remained the same, but certain data entered into the Model and assumptions built into the Model changed after Mesaba reexamined it after receiving the Unions' objections on June 21.  Furthermore, the electronic version of the Northstar II Model did not exist as of Mesaba's June 12 filing of the Renewed Motion.  Finally, Mesaba provided the Unions with a hard copy of all of the changes within a day of Mesaba's re-run of the Model.

The fact that Mesaba responded to the Unions' objections by correcting the output from its Model does not mandate a finding that it failed to provide accurate and relevant information.  As the bankruptcy court noted, the changes that Mesaba made did not alter its Renewed Section 1113 Proposals - namely its need for a 19.4% labor cost cut and six-year contract.

### c.      Requirement to Meet and Confer in Good Faith

"During the period beginning on the date of the making of a proposal . . . and ending on the date of the hearing . . . the trustee shall meet, at reasonable

times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement."  11 U.S.C. § 1113(b)(2).  Under American Provision, this obligation is interpreted as two requirements: that the debtor "meet at reasonable times with the Union," and that "[a]t the meetings the debtor . . . confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement."  44 B.R. 907, 909 (Bankr. D. Minn. 1984).  The Unions claim that Mesaba failed both requirements.

### i.      Failure to Meet

The Unions assert that Mesaba failed this requirement in two ways: 1) Mesaba did not meet with AFA after June 5 and before the start of the hearing on the Renewed Motion, and 2) Mesaba did not meet with ALPA on Saturday, June 24, or Sunday, June 25, regarding the amended true-up proposal that Mesaba sent to the Unions on Friday, June 23.  The hearing on the Renewed Motion began on Monday, June 26.

Although Mesaba was obligated to fulfill the meeting requirement between the filing of its Renewed Section 1113 Motion and the hearing on that motion, these meetings must be placed in the larger context of the parties' ongoing negotiations.  From the time that Mesaba made its Original Section 1113 Proposals through the date of the hearing on the Renewed Motion, it met with

AMFA at least 16 times, with AFA at least 22 times, and with ALPA at least 40 times.  The bankruptcy court found that the additional meetings after its May 18 Order were unlikely to be productive because the Unions clearly stated that they would not agree to the 19.4% cut or the six-year contract, both of which the bankruptcy court had found to be necessary components of Mesaba's proposals in its May 18 Order.  The court concluded that, based on, among other things, "the arrangements for meetings that the Debtor made, and the sessions actually conducted as they were," Mesaba had "at least barely met the requirements . . . that it meet with the Unions at reasonable times, and that it have conferred in good faith during those meetings to try to reach consensual accords."  (July 14, 2006 Tr. at 81.)  The bankruptcy court also concluded that Mesaba "was not unreasonable in pushing the process forward even more quickly this time than the last.  It was not the Debtor's fault that various of the Unions' negotiators . . . were unavailable during [times] the Debtor[] had suggested for extended bargaining sessions during early June 2006.  The Unions didn't have alternate negotiators in reserve to pick up the duty for those who were unavailable."  (Id. at 82.)

Within this context, the Court now examines the Unions' specific objections.

### aa.    AFA Negotiations

Mesaba presented the Renewed Section 1113 Proposals to AFA at a meeting on June 1, 2006.  At that meeting, Mesaba stated that it would file a renewed

Section 1113 motion on June 12 if an agreement had not been reached by that date.  On June 2, Mesaba's financial analysts met with AFA's financial analysts. On June 5, Mesaba and AFA met, and AFA provided a counterproposal to Mesaba with a three-year term and less than a 19.4% labor cost reduction.

On June 9, Mesaba informed AFA that its information requests regarding the value of the proposal remained outstanding, but that once the information was provided and evaluated, Mesaba would contact AFA to schedule a meeting. AFA provided the information on June 11, but Mesaba never contacted AFA to schedule further negotiations.

In addition to the in-person meetings, on June 11, Mesaba provided AFA with written answers to its questions about Mesaba's June 1 proposal.  On June 12, Mesaba provided AFA with term sheets and costing sheets for AMFA, ALPA, customer service agents, and management.

It was not clearly erroneous for the bankruptcy court to determine that, within the context Mesaba's accelerated time frame for the Renewed Motion and Mesaba's previous negotiations with AFA regarding the 19.4% cut and six-year contract, the three in-person meetings plus email exchanges regarding the Renewed Section 1113 Proposals that occurred before the hearing satisfied the meeting requirement.

### bb.    ALPA Weekend Negotiations

33

In its May 18 Order, the bankruptcy court concluded that Mesaba had
provided insufficient evidence for its assumption in the Mercer Model that its
most senior - and thus, most expensive - unionized employees would remain after
cuts were imposed.  341 B.R. at 743-46.  It suggested that Mesaba include a "true-
up" contingency in its proposals so that if senior unionized employees did depart,
lessening Mesaba's labor costs, the remaining unionized employees' compensation
would be higher.  Id. at 745-746.  In response to the court's suggestion, Mesaba
included an attrition true-up provision in its Renewed Section 1113 Proposals.  In
its July 14 decision, the bankruptcy court held that Mesaba's true-up proposal in
its Renewed Section 1113 Proposals mirrored the proposal suggested by the
Court.  (July 14, 2006 Tr. at 68.)

On June 2, Mesaba told ALPA that it would meet with it that evening to
discuss its revised true-up proposal, but ALPA declined to meet and requested that
the revisions be sent by email.  Mesaba also asked for a response to the proposal
from ALPA.  After June 2, ALPA did not respond to Mesaba until June 8, at which
time it stated that it would be unavailable to negotiate until June 19.  On June 20,
ALPA submitted a written counterproposal.  It submitted a costing of its
counterproposal on Friday, June 23.

From June 2 through June 23, ALPA did not ask to meet with Mesaba to
discuss the true-up proposal.  In response to the Unions' June 21 objections,

Mesaba again revised the true-up language on June 23.  On Saturday, June 24, and Sunday, June 25, ALPA requested a meeting with Mesaba to go over the revised true-up proposal.  Mesaba refused to meet.

The Unions admit that ALPA was unavailable to meet with Mesaba for much of June, but argue that Mesaba could have met with ALPA during the end of June.  They conclude that Mesaba's refusal to meet in person with ALPA over the weekend to discuss the true-up language violated the reasonable meeting requirement.

The Court affirms the bankruptcy court's conclusion that Mesaba met the reasonable meeting requirement with ALPA.  It would have been desirable for Mesaba to have met with ALPA the weekend before the Renewed Section 1113 Motion hearing to discuss the revised true-up provision.  However, Mesaba cannot be said to have acted unreasonably.  Its original true-up proposal was included in the June 1 Renewed Section 1113 Proposals, and Mesaba offered to meet with ALPA on June 2, but ALPA would not agree to meet until weeks later and did not even request a meeting with Mesaba on the true-up issue until the weekend before the hearing.

### ii.    Failure to Confer in Good Faith

The Unions claim that Mesaba failed to confer in good faith by proposing non-negotiable terms, by refusing to bargain over "snap-back" provisions, and by

deviating from the norms of collective bargaining.  "Good faith bargaining is

conduct indicating an honest purpose to arrive at an agreement as the result of

the bargaining process."  <u>In re Blue Diamond Coal Co.</u>, 131 B.R. 633, 646 (Bankr.

E.D. Tenn. 1991) (quotation omitted).

### aa.    Non-negotiable Terms

The Unions note that Mesaba proposed three non-negotiable terms: 1) a

19.4% cut in labor costs, 2) a six-year contract term, and 3) no increase in

employee compensation during the six-year term.  In its May 18 Order, the

bankruptcy court held that Mesaba did not demonstrate bad faith by refusing to

vary from these three points in its bargaining.  <u>In re Mesaba Aviation, Inc.</u>, 341

B.R. 693, 726-27 (Bankr. D. Minn. 2006).

Although generally, "a debtor cannot be said to comply with its obligation .

. . to 'confer in good faith in attempting to reach mutually satisfactory

modifications' when it steadfastly maintains that its initial proposal . . . is

non-negotiable," it may make parts of its Section 1113 proposal non-negotiable if

they are essential to its reorganization.  <u>In re Delta Air Lines</u>, 342 B.R. 685, 697

(Bankr. S.D.N.Y. 2006) (citation omitted).  Thus, when the debtor's cost-saving

target is necessary, it is not bad faith to adhere to it.  <u>See, e.g.</u>, <u>In re Indiana</u>

<u>Grocery</u>, 136 B.R. 182, 195-96 (Bankr. S.D. Ind. 1990) (holding debtor's proposal

was not "on a take it or leave it basis" because it was willing "to negotiate on any

point as long as result was the overall 16.5% labor cost reduction").

Because the Court affirms the bankruptcy court's finding that a 19.4% labor cost cut and six-year fixed contracts were necessary, it also affirms the bankruptcy court's finding that Mesaba negotiated in good faith by presenting those necessary provisions and refusing to negotiate away from them.  Because these provisions are necessary then, so long as Mesaba was willing to negotiate on other points, it did not have an obligation to offer to accept provisions that were not sufficient to provide a successful reorganization.

### bb.    Snap-Back Provisions[3]

Mesaba refused to negotiate over the Unions' snap-back proposals.  The Unions assert that bankruptcy court failed to separately analyze the substantive necessity of a snap back and the procedural necessity of negotiating in good faith over a snap back.  They contend that when they made snap-back proposals, even if Mesaba did not have an obligation to propose or accept them, it did have an obligation to negotiate over them to satisfy the good faith requirement in Section 1113.

---

[3]A "snap-back" provision is a labor negotiation term used to describe a provision that "would provide for an automatic restoration of pre- § 1113 wage or benefit provisions if the Debtor's operations returned to a state of solvency sufficient to fund them, or for a reopening of negotiations on these terms upon a designated level of improvement in the Debtor's financial condition."  341 B.R. at 743.

The bankruptcy court concluded that Mesaba's Original Section 1113 Proposals met the necessity requirement although they did not include a snap back provision because inclusion of snap backs would be "futile" and would hinder reorganization.  341 B.R. at 743.  Thus, the bankruptcy court held that Mesaba did not have an obligation to include snap-back provisions in its Section 1113 Proposals.  Id.  The court also concluded that "given the outcome on the substantive aspect . . . it is enough to say that the Debtor did not lack good faith in its proposal and bargaining in this regard either."  Id. at 723.  In its July 14 decision, the bankruptcy court upheld Mesaba's continued refusal to bargain over snap backs based on the court's May 18 Order.  (July 14, 2006 Tr. at 79-80.)

A debtor is not always required to include a snap-back provision in its Section 1113 proposals.  In re AppleTree Markets, 155 B.R. 431, 440 (S.D. Tex. 1993); In re Matter of Walway Co., 69 B.R. 967, 974 (Bankr. E.D. Mich. 1987).  However, "[s]nap-back provisions in modification proposals are favored because they ensure that once a company is profitable enough for successful reorganization, further profits not 'necessary' for reorganization are returned to the employees who made the concessions."  In re Indiana Grocery Co., Inc., 136 B.R. 182, 192 (Bankr. S.D. Ind. 1990).  In order to meet the requirement of good faith bargaining under Section 1113, a debtor must at least consider the possibility of including a snap-back provision in its proposals.  See In re Liberty Cab &

38

Limousine Co., Inc., 194 B.R. 770, 776-77 (Bankr. E.D. Pa. 1996) (refusing to approve Section 1113 proposal when, among other things, debtor refused to consider snap back and directing parties to return to negotiations and consider "the propriety, if any, of the inclusion of a snap back clause"); In re Garofalo's Finer Foods, Inc., 117 B.R. 363, 373 (Bankr. N.D. Ill. 1990) (holding "the absence of snap back provisions in the Debtor's original proposals, **in light of the undisputed evidence that it has been willing to negotiate same**, is not fatal to the requested relief") (emphasis added); In re Matter of Walway Co., 69 B.R. at 969, 974 (holding that debtor's failure to agree to the union's snap-back proposal did not prevent approval of the proposal, but noting that the debtor had "considered the proposal" and that the debtor's Section 1113 proposal was based on best-case-scenario projections).

Mesaba has pointed to no admissible evidence in the record to support the bankruptcy court's conclusion that inclusion of snap backs would be futile and would hinder Mesaba's reorganization.  It has not shown any evidence that snap backs would be so detrimental to its reorganization that its complete failure to consider them was justified.  Under these circumstances, the Court concludes that Mesaba demonstrated bad faith by wholly refusing to negotiate regarding snap

backs.[4]

### cc.   Deviation from Norms of Collective Bargaining

The Unions argue that Mesaba failed to follow the norms of collective

bargaining by failing to provide updated financial information, by using the same

trial lawyers as lead negotiators, and by requiring the Unions to put

communications in writing rather than meeting face-to-face.

Based on the Court's earlier discussion regarding Mesaba's satisfaction of

Section 1113's information requirements, the Court concludes that Mesaba did

not substantially deviate from the bargaining norms under Section 1113 by failing

to provide relevant financial information before the hearing on the Renewed

Section 1113 Motion.

The Unions assert that Mesaba's decision to have its lead negotiators also

serve as lead trial counsel constituted bad faith.  Union witnesses testified that this

---

[4]The Court is not deciding that Mesaba must include snap backs in its Proposals; it is possible that the absence of snap backs might be justified. However, the Court notes that inclusion of snap backs would be a large step towards reaching mutual agreement and cultivating trust with the Unions.  The Court is certain that Mesaba's upper management will not give up the possibility of increasing their compensation in the event that Mesaba's recovery is more profitable than expected.  See Mesaba, 341 B.R. at 753-54.  When United Airlines recently emerged from bankruptcy, its executives received handsome compensation, including a quickly vesting bonus in the form of shares estimated to be worth $115 million.  Gretchen Morgenson, Gee, Bankruptcy Never Looked So Good, N.Y. Times, Jan. 15, 2006, at 31.

decision was unusual.

The bankruptcy court reasoned,

> [T]hough the practical wisdom of this staffing practice can be questioned, and its ultimate efficacy for successful bargaining is probably low, it cannot be branded as a deliberate tactic to inflame union representatives in bargaining or to derail negotiations.  At best, it was an election flawed in its conception, most likely prompted by a particular notion of economy for the bankruptcy estate and the limitations on the availability of enough personnel to serve all functions in a very intense process.

341 B.R. at 720-21 (footnote omitted).

The Court affirms the bankruptcy court's finding that Mesaba did not act in bad faith by using the same counsel for both trial and negotiation.  There is no legal authority that Mesaba had an obligation to use separate counsel, particularly when it is a small airline with limited resources in bankruptcy.

Because the Unions provide no evidence to support their allegation that Mesaba generally insisted on written, as opposed to face-to-face, communication, and because Mesaba did meet with the Unions multiple times both before and after the first hearing, the Court affirms the bankruptcy court's finding of good faith.

### 4. Whether the Proposed Modifications Assure that All Parties Are Treated Fairly and Equitably

The Unions claim that Mesaba failed to meet the Section 1113 requirement stating that, before seeking to reject a collective bargaining agreement, the debtor

"make a proposal . . . [which] assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably."  11 U.S.C. § 1113(b)(1)(A).  "The purpose of this provision . . . is to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree."  Truck Drivers Local 807 v. Carey Transp. Inc., 816 F.2d 82, 90 (2d Cir. 1987) (citation omitted).

The bankruptcy court reasoned that all of Mesaba's labor groups, including management and non-union employees, face the same 19.4% reduction of aggregate costs related to their employment, and all employees face the same increase in individual contribution to health care premiums, from 25% to 50%.  Mesaba, 341 B.R. at 749-50.  The court did not explicitly analyze the equity of the Section 1113 proposals in the context of non-labor constituencies.  Id. at 748-56.  In its July 14 decision, the bankruptcy court acknowledged that AFA had raised an objection to the fair and equitable element regarding MAIR, but rejected it "out of hand" because no evidence had been developed on that point.  (July 14, 2006 Tr. at 77.)

The bankruptcy court had an obligation to analyze the treatment of all major creditors and other affected parties.  See In re Elec. Contracting Servs. Co., 305 B.R. 22, 28 (Bankr. D. Colo. 2003) ("A debtor will not be allowed to reject a union contract where it has demanded sacrifices of its union without

shareholders, non-union employees and creditors also making sacrifices."). The Unions specifically allege that the bankruptcy court erred by failing to consider how MAIR might share the burdens of reorganization.

The Unions do not challenge the bankruptcy court's finding that Mesaba's Proposals treat union employees, management and non-contract hourly employees fairly and equitably. Additionally, elsewhere in its May 18 Order, the bankruptcy court did address the extent of concessions Mesaba is requiring from some non-labor groups. For instance, the court noted that Mesaba arrived at the 19.4% labor cost reduction figure "only after extracting as much as [it] could out of" the areas of administration and physical plant, vendors, and reduced inventory and rental. 341 B.R. at 709. The Unions did not challenge the projected savings achievable in non-labor operational costs. Id. at 709 n.14.

Although the bankruptcy court did examine the effects of the Proposals on some affected groups, it failed to address the treatment of MAIR, Mesaba's sole shareholder and a major affected party in this matter. Although the court felt that the parties failed to present adequate evidence on this topic for it to reach a conclusion, Mesaba, not the Unions, bears the burden of proving by a preponderance of the evidence that all creditors, the debtor and all of the affected parties are treated fairly and equitably. In re Mesaba Aviation, Inc., 341 B.R. 693, 749 (Bankr. D. Minn. 2006) (noting that Mesaba "has the burdens of production

and persuasion" on the fair and equitable element); <u>In re Indiana Grocery Co.,</u> <u>Inc.</u>, 136 B.R. 182, 194-95 (Bankr. S.D. Ind. 1990) (holding that, "though necessary, . . . wage reductions must also be fair and equitable" and that debtor "failed to prove that top management and creditors are bearing an equitable burden in [its] reorganization, and thus, that all affected parties are treated fairly and equitably").

Mesaba argues that, at this early stage in the bankruptcy, it is difficult to determine how the interests of other constituencies, such as MAIR, will be resolved and to weigh their concessions against the Unions'. <u>In re Northwest</u> <u>Airlines</u>, 346 B.R. 307, 326 (Bankr. S.D.N.Y. 2006). While this reasoning may have merit, it was not adopted by the bankruptcy court. Mesaba had the obligation to at least address the effects of reorganization on all relevant constituencies, including MAIR.

The Court does not hold that Mesaba must address the burden to be shared by every possible party affected by its bankruptcy; however, MAIR[5] is a major player in this bankruptcy. "It would probably be an unreasonable burden for a debtor to have to get and prove burden sharing by every one of its creditors, but a debtor should show that major creditors who stand to benefit greatly from

---

[5]And, as noted previously, Northwest, the party that largely controls Mesaba's fate, owns 27.5% of MAIR.

successful reorganization and from concessions employees make . . . are bearing in some manner their fair share of the burden of reorganization." In re Indiana Grocery Co., Inc., 136 B.R. at 195.  Mesaba cannot avoid its burden under this factor by failing to present evidence of any effect upon MAIR whatsoever.

On remand, the bankruptcy court must consider whether Mesaba has met its burden of proof to show that the Proposals treat the Unions fairly and equitably in light of any sacrifices that MAIR may be asked to make in this reorganization.

### 5. Whether the Unions Had Good Cause to Reject Mesaba's Proposals

The Unions claim that they had good cause to reject Mesaba's Proposals; thus, Mesaba failed to meet its burden to demonstrate that they failed to accept its Proposals without good cause.  As the bankruptcy court noted, almost invariably, "if a debtor-in-possession goes through the procedural prerequisites for its motion, and if the substance of the proposal ultimately passes muster . . . , its union(s) will not have good cause to have rejected the proposal."  341 B.R. at 755.

The Unions present three main reasons why they had good cause to reject Mesaba's Proposals: 1) the 19.4% labor cost reduction was too deep; 2) the cut would drive Union members' wages too low; and 3) Mesaba rejected their reasonable counterproposals.

First, the Unions assert that Mesaba's insistence on a 19.4% cut in labor

costs justified their rejection.  None of the Unions agreed to such a cut, all offering significantly smaller cuts.  Because the bankruptcy court did not err in finding that the 19.4% labor cost cut was necessary and equitable and was supported by both the Mercer Model and the updated Northstar Model, the Unions did not have good cause to reject it.

Second, the Unions argue that the wage cuts proposed by Mesaba would bring all employees' wages at or below industry levels, even driving some wages below poverty levels.  The bankruptcy court acknowledged that the impact of the cuts on flight attendants with less than five years of seniority would be "an utter horror."  341 B.R. at 759 n.100.  Mesaba notes that it has a high per-capita labor cost due to seniority and that the substantial pay reduction for many of Mesaba's pilots is not due to Mesaba's Section 1113 Proposals but to Northwest's decision to cut Mesaba's jets from its fleet.

The bankruptcy court found that if Mesaba did not impose cuts, it would be liquidated, and all Mesaba employees would lose their jobs.  341 B.R. at 757-58. Cf. In re Valley Steel Prods. Co., Inc., 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992) ("It is clear that the Proposals would have a negative impact on the Teamster Drivers' incomes.  It is equally clear that if the Debtors do not receive these concessions they will be forced to liquidate and the Teamsters will be unemployed.").

46

Because the challenged components of Mesaba's Section 1113 Proposals are necessary for Mesaba's viability, and Mesaba met the other Section 1113 requirements with regard to those components, the Unions did not have good cause to reject the Proposals.  While the low wages imposed by the Proposals understandably motivated the Unions to reject the Proposals, they do not constitute good cause under the Bankruptcy Code.

Third, the Unions claim that they had good cause to reject Mesaba's proposals because it refused to consider counterproposals by ALPA or AMFA.  The bankruptcy court made the factual determination that the Unions' counterproposals did not meet Mesaba's necessary requirements.  (See, e.g., July 14, 2006 Tr. at 79 ( "All of the Unions' proposals provided for three-year duration and not the six that I had found the Debtor was not out of bounds in proposing the first time around.").)  This finding was not clearly erroneous.

The Court has affirmed the bankruptcy court's findings that the 19.4% labor cost cut and the six-year fixed contract duration are necessary elements of Mesaba's Renewed Section 1113 Proposals; thus, Mesaba was justified in refusing to consider the counterproposals because they did not preserve Mesaba's necessary savings.  See In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir. 1992) ("Thus, for example, a union will not have good cause to reject an employer's proposal that contains only those modifications essential for the

47

debtor's reorganization, that is, the union's refusal to accept it will be held to be without good cause.") (citation omitted).

### 6.    Whether the Balance of the Equities Favors Rejection

The bankruptcy court examined six factors when determining whether the balance of the equities clearly favors rejection of the CBAs:

> (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

Mesaba, 341 B.R. at 757 (quoting Carey Transp., 816 F.2d at 93).

The bankruptcy court concluded that the first factor, likelihood and consequences of liquidation if rejection is not allowed, outweighed the other factors, including the third factor, the likelihood and consequences of a strike upon rejection.  341 B.R. at 757.  The court also held that the cost-spreading abilities factor and the good or bad faith factor weighed in favor of rejection.  Id. at 759-60.

The Unions assert that the bankruptcy court erred in failing to adequately consider the likelihood and consequences of strikes by all three major unions.

They claim that if Mesaba imposes its Renewed Section 1113 Proposals, the Unions will exercise their right to strike, resulting in likely liquidation for Mesaba.

The bankruptcy court found that the balance of the equities clearly favors granting Section 1113 relief because had its motion been denied, Mesaba would have been liquidated.  <u>Mesaba</u>, 341 B.R. at 757.  The Court has already upheld the bankruptcy court's conclusion that Mesaba's proposed labor cuts are necessary for its organization.

The Court reviews the bankruptcy court's balancing of the equities for abuse of discretion and largely defers to that court's judgment.  <u>See, e.g.</u>, <u>Shurgard Storage Ctrs. v. Lipton-U. City, LLC</u>, 394 F.3d 1041, 1046 (8th Cir. 2005); <u>Heartland Acad. Cmty. Church v. Waddle</u>, 335 F.3d 684, 691 (8th Cir. 2003). When the bankruptcy court must "balance several factors, often including equitable considerations of matters specific to the conduct of the particular action," it has "a comparative advantage over" the reviewing court.  <u>Salyton v. Am. Exp. Co.</u>, – F.3d – , 2006 WL 2252510, at *8 (2d Cir. Aug. 7, 2006).  The bankruptcy court "has a familiarity with the whole case and a refined sense of the legitimate needs of the parties, and is therefore better able than an appellate tribunal to choose among multiple reasonable but incompatible results."  <u>Id.</u>

In this case, the bankruptcy court examined the likelihood and consequences of a strike with consideration.  It acknowledged that such as strike

would be devastating, but also concluded that Mesaba would be liquidated in the

absence of the labor cost cut, so that the threat of a strike did not justify denying

Mesaba's motion.  The bankruptcy court reasoned that if a strike would cause

liquidation, then the strike would not be within the best interest of the Unions'

members.  The court acknowledged each of the <u>Carey</u> factors and carefully

weighed the factors applicable to the case on the evidence in the record.  It did

not abuse its discretion in concluding that the equities clearly weighed in favor of

granting Mesaba's motion.

> **C.    Whether the Bankruptcy Court Erred in Precluding the Unions
> from Conducting Discovery and Presenting Evidence Regarding
> Mesaba's Potential Claims Against MAIR**

The Unions note that even when Mesaba only generated a 2%-3% EBIT

margin, it made substantial payments to MAIR in the form of dividends and

management fees.  MAIR was cash-rich when Mesaba filed for bankruptcy.  Soon

after Mesaba presented its Original Section 1113 Proposals, the Unions sought to

discover whether Mesaba's bankruptcy estate might have claims against MAIR

such as fraudulent conveyance or breach of fiduciary duty.  These issues are being

separately investigated by the committee of unsecured creditors.

In its February 10, 2006 Order, the bankruptcy court prohibited the Unions

from seeking "discovery of facts from any party in order to establish or investigate

claims against MAIR that the Debtor or its estate may hold in the context of the

Section 1113 Motion." (Feb. 10 Order ¶ 18.)  The Order also prohibited introduction of any "evidence allegedly supporting claims against MAIR" at the Section 1113 hearing.  (<u>Id.</u> ¶ 19.)  The court left open the possibility of investigating these claims outside of the context of the Section 1113 Motion.  The Unions claim both of these decisions were in error.

The bankruptcy court concluded that the possible recovery of payments from MAIR was not relevant or material to the Section 1113 issues before the court.  It reasoned that a one-time influx of cash from a MAIR recovery was not relevant to Mesaba's Section 1113 Motion; instead, the court would focus only on "operational factors."  The bankruptcy court also concluded that investigation into possible claims against MAIR would be too complex, time-consuming, and uncertain in the context of Mesaba's Section 1113 Motion.  Finally, the court noted that any recovery from MAIR would go to Mesaba's creditors.

This Court reviews the bankruptcy court's decision to deny discovery for abuse of discretion.  <u>In re Nat'l Warranty Ins. Risk Retention Group</u>, 384 F.3d 959, 964 (8th Cir. 2004).  "This deferential standard means 'that the court has a range of choice, and its decision will not be disturbed as long as it stays within that range[,] is not influenced by any mistake of law' or fact, or makes a clear error of judgment in balancing relevant factors."  <u>Pamida, Inc. v. E.S. Originals, Inc.</u>, 281 F.3d 726, 729 (8th Cir. 2002) (citation omitted).

51

The Unions assert that a large recovery against MAIR could provide cash that Mesaba could use in the ordinary course of business to pay its employees, ameliorating the need for labor cuts, or could apply towards exit financing. Thus, the existence of such potential causes of action against MAIR could bear on whether the amount of Section 1113 relief Mesaba seeks is necessary. Additionally, they argue that a recovery could be used as a cash inducement to a network carrier to provide Mesaba with more business.

Ultimately, the bankruptcy court examined only operational factors when holding that the 19.4% labor cost cut was necessary. The existence or absence of a one-time cash recovery was not considered.

The Court concludes that the bankruptcy court did not err in basing its necessity decision on Mesaba's operational expenses. The discovery of the possibility of a one-time infusion of cash would be helpful to the estate, for instance in continuing operations for a longer period of time; however, it would not cure Mesaba's ongoing money loss each month; it would merely delay the exhaustion of Mesaba's cash. The absence of sustainable operations would hinder exit financing and route bidding. Furthermore, the bankruptcy court did not clearly err when it found that mainline carriers, such as Northwest, would only seek inducements after regional bidders had already submitted satisfactorily low-cost bids. 341 B.R. at 746. Thus, Mesaba's operating cost structure must be viable

before it would be in a position to offer inducements.  Id.

Additionally, the Court concludes that the bankruptcy court acted within its discretion when it decided that discovery regarding speculative, unfiled claims against MAIR, a publicly-traded corporation, would also be too complex, time-consuming, and tangential in the context of the present motion.

The issues presented by the discovery order are a close call.  The Unions raise reasonable arguments supporting their desire for discovery regarding potential claims against MAIR.  MAIR and Mesaba share a close relationship and MAIR has become cash-rich while Mesaba floundered.  Mesaba may have viable claims against MAIR, and recovery on those claims could help Mesaba emerge from bankruptcy.  However, the bankruptcy court concluded that investigation of these potential claims should occur elsewhere in the litigation because the Section 1113 motion was not the appropriate context for the investigation.  The Court gives deference to the bankruptcy court's decisions regarding discovery and concludes that, in this case, the bankruptcy court did not abuse its discretion.

Based on the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.  The bankruptcy court's Order Granting Debtor's Renewed Motion for Authority to Reject Collective Bargaining Agreements issued on July 14, 2006; memorialized decision made on the record in court on July 14, 2006; and incorporated Order Denying Debtor's Motion for Authority to Reject Collective Bargaining Agreements dated May 18, 2006; are **REVERSED** with regard to their analysis and holdings

related to the fair and equitable factor and the good faith negotiation of snap-back provisions.  These orders are **AFFIRMED** in all other respects.

2. The bankruptcy court's Order Granting Debtor's Motion for Order Setting Pre-hearing Schedule, for Protective Order, and for Order in Limine in Connection with Debtor's Motion to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. Section 1113 of February 10, 2006, is **AFFIRMED**.

3. This matter is **REMANDED** to the bankruptcy court for further proceedings consistent with this opinion.

Dated: September 13.2006
s / Michael J. Davis
Judge Michael J. Davis
United States District Court